

402 E. Southern Ave.
Tempe, AZ 85282
Telephone: (602) 888-9229
Facsimile: (480) 725-0087
D. Lamar Hawkins – 013251
JoAnn Falgout – 015052
Karen Bentley – 034148
E-Mail: **lamar@guidant.law**
**E-Mail: joann.falgout@guidant.law**
E-Mail: karen.bentley@guidant.law
Counsel for Debtor

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>RMLJ HOLDINGS 1, LLC, an Arizona limited liability company,<br><br>                   Debtor. | Chapter 11 Proceedings<br>[Subchapter V]<br><br>Case No. 2:24-bk-04630-BKM<br><br>**RESPONSE TO TERRIE MIXON'S MOTION** |

RMLJ Holdings 1, LLC, as the debtor and debtor-in-possession, (the "**Debtor**" or "**RMLJ**"), by and through counsel undersigned, hereby responds to the correspondence from Terrie Mixon filed with the Court at docket no. 75 (the "**Motion**") as follows:

I.     **FACTUAL BACKGROUND**

1. Sometime in the summer of 2023, the Debtor's member and manager, Philip Zweig ("**Zweig**") met Terrie Mixon ("**Mixon**").

2. Mixon represented to Zweig that she was a sophisticated real estate investor from Chicago, now living in Scottsdale, Arizona. She told Zweig that she was successful in renting out her Arizona properties to rich white people from Wisconsin and Chicago. She further told Zweig that she was working with a group of very wealthy millionaire real estate investors and, therefore, wanted to see Zweig's homes that were and are short term rentals

with Airbnb. She drove over to Zweig's home at 1933 E. Gemini Place, Chandler, Arizona to see it.

3. Mixon then viewed the homes at 897 E. Cherry Hills Drive, Chandler, Arizona (the "**Cherry Property**") and at 5322 E. Dallas Street, Mesa, Arizona (the "**Dallas Property**"); the two properties in Kearny, Arizona; and three other properties in Phoenix.

4. Mixon would arrive with a different new Mercedes each time she viewed Phoenix homes with Zweig. When she and Zweig went to Kearny, she arrived in a new Land Rover and had Zweig drive it to Kearny. She told Zweig that she paid cash for all of her vehicles and also paid cash for her 5,500 square foot, one-level home with a four-car garage.

5. Zweig was very impressed with her success and knowledge of the real estate market.[1] Mixon said that she would like to invest with Zweig. Zweig told her he had a cash flow problem with his properties, and Mixon, not wanting RMLJ to go under, decided to invest in RMLJ by loaning it $50,000.00 at 10% interest. Zweig did not ask her for the loan; she offered it.

6. On September 21, 2023, Mixon met Zweig at the Chase Bank in Scottsdale and deposited $60,000.00, which was more than previously offered, saying she thought that RMLJ would need another $10,000.00. Mixon took $500.00 from that $60,000.00, saying it was for RMLJ's weekly expenses.

7. Zweig and Mixon agreed that the funds would be repaid upon the sale of the Dallas property, "with interest on the unpaid principal balance commencing on sale of subject property, util paid, at the rate of (10.0%) per annum." *See* Promissory Note Secured by Deed of Trust," dated September 21, 2023, attached to Mixon's Motion (.pdf pg. 15 of 36) ("First Promissory Note").

---

[1] Mixon states that it is "important for the Court to know" that she suffers from "birth injuries, in which all [her] limbs are affected." However, that seems irrelevant to the fact that she is mentally astute and competent. Mixon never provided any indication that she was mentally impaired in any way and in fact, she repeatedly told Zweig that she had had much success in the real estate market.

2

8. Mixon then asked Zweig if he would prepare a deed of trust to be recorded against the Dallas Property. Zweig prepared the Deed of Trust and recorded it as she requested; this is the recorded Deed of Trust attached to the Motion. (*See* .pdf pp. 16-18 of 36). Zweig had every intention to pay her back and even gave her full control of the $60,000.00 in the bank account (*see* pages of account statements attached to the Motion).

9. Mixon had all the lenders' phone numbers, knew what all the loan balances were, and took over accounting functions for RMLJ. Thus, she knew or should have known what the first lienholder's balance was on the Dallas Property.

10. Initially, Mixon and Zweig planned to sell the Dallas Property for $317,000.00, and a buyer was located and a closing date was scheduled.

11. However, it turned out that the first lienholder (Fay Servicing, as servicer for RTL REO, LLC) ("**Fay**") asserted a higher balance than the parties had expected: $278,663.33. This amount, plus the closing costs, meant that Mixon would only get paid $17,231.05 and not the full balance of $66,000.00 that she asserted would be due to her if the sale went forward.[2] The higher-than-expected lender loan balance was because Fay asserted a claim for default interest accrued at the time of the scheduled closing in the amount of $40,510.51. Before this attempted sale of the property, Zweig was not aware that the lender was charging a 36% default interest rate.[3]

12. Mixon was reluctant to release her lien on the Dallas Property, which complicated the sale, and Mixon and Zweig subsequently decided to walk away from the brokered sale and to sell the Dallas Property themselves "by owner," and without including the new furniture that had previously been included as part of the offer for sale.

---

[2] This Debtor asserts that this calculation was incorrect, given that the First Promissory Note provided that interest would begin upon the sale of the property.

[3] The Debtor asserts that Fay wrongfully added the default interest and a late fee to the payoff figures when providing a final payoff on the loan for the Dallas Property, because the amount claimed was unreasonable and an unenforceable penalty under Arizona law. *See Dobson Bay Club II DD, LLC v. La Sonrisa de Siena, LLC*, 242 Ariz. 108 (2017).

13. However, the next day Mixon called Zweig and said that God had told her to take the $17,231.05 and close the deal. Ultimately, they did not end up agreeing to close the deal.

14. The second promissory note, dated November 3, 2023, for $49,200 (attached to Mixon's Motion at .pdf page 27 of 36) (the "Second Promissory Note") was not evidence of a second loan; it merely reflected the parties' calculations, on November 3, 2023, when the proposed sale was pending, of the amount that would remain due after the Dallas Property sold, and was thus based on the parties' understanding at the time that Mixon would be paid $17,231.05 from the sale of the Dallas Property, which was to occur on or before November 10, 2023. Mixon wanted the remaining loan amount due (which she calculated at $49,200.00[4]) to be secured by the Cherry Property. However, the sale of the Dallas Property never occurred, so the securitization of the Cherry Property also never occurred.

15. Mixon alleges that Zweig told her he would record a Deed of Trust and did not record it; however, Zweig did record a deed of trust against the Dallas Property, just as she requested and he agreed. With regard to the Cherry Property, Zweig recorded what was given to him and that was the document entitled "Promissory Note Secured by Deed of Trust," attached to Mixon's Motion at .pdf pg. 27 of 36) (the "Second Promissory Note"). Thus, Zweig recorded the Second Promissory Note in the Maricopa County Recorder's Office as Document No. 2023-0573353, at Mixon's request. To the best of Zweig's knowledge, there was no separate Deed of Trust for the Cherry Property, and no such deed of trust is attached to Mixon's Motion.

16. Zweig was not taking advantage of Mixon, and never asked her for any money. Mixon is business savvy, having worked with a CEO of a large company in

---

[4] This figure was based on the parties' then-current expectation that the Dallas Property would sell and was calculated by starting with the $66,000.00 original-loan-plus-interest amount that Mixon (incorrectly) asserted was to have been paid out of the Dallas Property closing, subtracting $17,231.05 (the amount of equity in the Dallas Property around November 7, 2023), further subtracting a $400.00 credit for Philip, and adding $800.00 that Mixon had paid for flooring). The total of these calculations was $49,168.95, which was rounded up to $49,200.00.

4

Chicago, and is very knowledgeable about the business world and how to protect her investments and her investment group.

17. Even after these events, Mixon kept pursuing Zweig for investment opportunities and to go into business with her. Indeed, just before Mixon filed the Arizona civil court action against Zweig (Maricopa County Superior Court case Number CV2023-095772, currently stayed because of the bankruptcy filing), she asked him to find a twenty-unit apartment building or a medical complex that she could pay cash for, and she would make him a partner to run the business and she would take care of accounting.

18. Mixon loaned Zweig the money of her own free will and was very happy with the idea that she would earn a 10% return on her loan over what would have originally been a very short period of time—approximately 6 or 7 weeks.

## II. ARGUMENT

Issues involving the existence and validity of liens should be addressed in an adversary proceeding; this Motion is an inappropriate vehicle for raising these issues. *See* Fed. R. Bankr. P. 7001(2) (defining "adversary proceeding" to include "a proceeding to determine the validity, priority, or extent of a lien or other interest in property."). Zweig will be filing an adversary complaint seeking this Court's determination that Mixon's alleged secured claim against the Cherry Property is invalid. If Mixon wants to confirm the validity of her asserted lien against the Dallas Property or the Cherry Property, she likewise could and should bring an adversary proceeding.

The arguments below will be made more thoroughly in the Debtor's adversary proceeding. Here, it is sufficient to demonstrate that there are meritorious arguments that Mixon's allegations do not tell the whole story, that she is not entitled to any lien against the Cherry Property, and that this Court certainly should not simply order that her alleged and nonexistent deed of trust on the Cherry Property "remain(s)" valid, given that a valid deed of trust never existed and thus cannot "remain valid."

As the facts above and the documents attached to Mixon's Motion demonstrate, Mixon initially loaned Zweig $60,000, to be repaid with an additional 10% from the proceeds of the sale of the Dallas Property. The documentation for that loan included a

5

Case 2:24-bk-04630-BKM    Doc 82    Filed 11/12/24    Entered 11/12/24 16:39:41    Desc
Main Document    Page 5 of 8

Promissory Note and a separate Deed of Trust, both of which were recorded. (However, the proposed sale of the Dallas Property was canceled by the parties' mutual agreement and has not occurred, so those funds arguably are not even due yet.) Without waiving any rights to contest the validity of Mixon's alleged Deed of Trust with respect to the Dallas Property, Zweig notes that even assuming that Mixon's lien against the Dallas Property is valid, Fay's secured claim, as the first lienholder, exceeds the current value of the Dallas Property and therefore there is no equity left in the Dallas Property to allow a payout to Mixon. However, if the property were to sell for more than the amount of Fay's claim, at this time Zweig has not challenged the validity of the Deed of Trust on the Dallas Property and therefore Mixon may be entitled to enforce her alleged lien on the Dallas Property.

The Second Promissory Note, in the amount of $49,200, was based on the parties' expectation that the Dallas Property would be sold and that Mixon would receive payment from those sale proceeds of approximately $17,000. It was not a second loan, as evidenced by its very terms. *See* Second Promissory Note, attached to Mixon's Motion [.pdf page 27 of 36]. The Second Promissory Note states that the "lien on 5322 E. Dallas Street, Mesa , AZ. **Will be transferred to this [Cherry] property**" (sic; emphasis added). It (incorrectly) states that the original loan amount was $66,000, that the parties contemplated selling the Dallas Property on or before November 10, 2023, and that Mixon would receive $17,231.05 from that sale, which would leave a balance due after some additional small adjustments of $49,200. However, because the Dallas Property never sold, the condition precedent for the Second Promissory Note's attempted "transfer" of the lien to the Cherry Property never occurred—even if it were permissible to transfer a lien by recording a promissory note, which it is not.

Indeed, a promissory note is not a document that can be recorded to establish a valid lien pursuant to Arizona law. Under Arizona law, a party may execute (and record) a mortgage or a deed of trust as security. *See* A.R.S. §§ 33-701 through -750 and -801 through -821. The statutes do not provide that a promissory note may serve as "security." Here, Mixon asserts that she has a valid deed of trust with respect to the Cherry Property, but a deed of trust must include certain required provisions, including a legal description of

6

the encumbered property and identification of and mailing addresses for a *qualified* trustee and beneficiary, among other terms. *See, e.g.* A.R.S. §§ 33-802 through 804. The Second Promissory Note contains none of these provisions, and does not meet any other requirements for a valid Deed of Trust. Moreover, there is no statutory authority that would allow a lender to record a promissory note and have it serve as a "security interest" without an accompanying deed of trust or mortgage. (This was the basis of Zweig's allegations against Mixon in the State Court Action seeking treble damages for wrongful recording under A.R.S. § 33-420.)

Moreover, even assuming for the sake of argument that a party could record a promissory note to create a valid security interest in real property (which is incorrect), in this case because the condition precedent for transferring the asserted lien from the Dallas Property to the Cherry Property—the sale of the Dallas Property on or before November 10, 2023—never occurred, the transfer of the asserted lien also never occurred under the Second Promissory Note's terms. Thus, there are no facts to support any allegation that any kind of security interest was ever perfected against the Cherry Property in Mixon's favor.

Moreover, even assuming that this Court would properly address an "equitable lien" via a motion instead of via an adversary proceeding, Mixon has not even asserted any proper legal basis for allowing an "equitable lien" against the Cherry Property. First, due to Mixon's actions and the parties' subsequent agreement (which Mixon attempted to change), the condition precedent for having the lien transfer to the Cherry Property did not occur, and so there is no basis for asserting a lien against the Cherry Property based on the parties' mutual intent. Moreover, Zweig did not engage in fraudulent conduct that could otherwise serve as a basis for an equitable lien. Indeed, if there was any inequitable conduct here, it was Mixon's. Mixon told Zweig that she was experienced in real estate investments, actively pursued a working relationship with Zweig, and actively sought to loan RMLJ funds at an extremely high interest rate (10% of the amount loaned to be paid as interest when the property sold, which the parties expected to occur within less than two months after the loan was issued, is nearly 100% interest), and now seeks to enforce a lien against

both the original property for which a Deed of Trust was recorded *and* against a second property for which a Deed of Trust was never recorded.

If this Court decides that any decision at all can be based on this Motion, it should conclude that Mixon has asserted absolutely no basis for a lien against the Cherry Property and should find as a matter of law that her asserted security interest in that property is invalid. Otherwise, this Court should require an adversary proceeding to determine the validity of her asserted lien.

**WHEREFORE**, the Debtor respectfully requests that this Court deny Mixon's motion.

DATED this 12th day of November, 2024.

                                      GUIDANT LAW, PLC

                                      By: /s/ JoAnn Falgout #015052
                                          D. Lamar Hawkins
                                          JoAnn Falgout
                                          Karen Bentley
                                          402 East Southern Avenue
                                          Tempe, AZ 85282
                                          Counsel for the Debtor

**VERIFICATION**

I, Philip Zweig, state under penalty of perjury that I have reviewed the facts in the attached *Response to Terrie Mixon's Motion*, and I avow that they are true and correct based on my own personal knowledge and/or on information provided to me by others, on which I have reasonably relied.

Dated: November 12, 2024.          Signed: *Philip Zweig*
                                                          Philip Zweig (Nov 12, 2024 16:34 MST)
                                                       Philip Zweig

E-FILED this 12th day of November, 2024 with the U.S. Bankruptcy Court and copies served via the Court's CM/ECF Notification System this day on all parties that have appeared in the case.